## State of Vermont v. Edward C. Emilo

[479 A.2d 169]

No. 82-493

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed June 8, 1984

478 ›

*Richard G. English,* Addison County State's Attorney, Middlebury, for Plaintiff-Appellee.

*Sessions, Keiner & Dumont,* Middlebury, for Defendant-Appellant.

**Billings, C.J.** Defendant appeals his conviction in the Addison District Court on the charge of operating a motor vehicle without the consent of the owner. 23 V.S.A. § 1094. Prior to the trial on the merits, defendant filed a motion to suppress, V.R.Cr.P. 12(b)(3), requesting that "all information, statements and physical evidence" gathered subsequent to his arrest be suppressed on the ground that the stopping of his car was effected without reasonable suspicion of wrongdoing, in violation of the Fourth Amendment to the United States Constitution. The motion was denied. At the trial before the court,

defendant again raised his motion to suppress. *State* v. *Blondin*, 128 Vt. 613, 616, 270 A.2d 165, 166 (1970) (pretrial motion may be reconsidered at trial). At the close of testimony,[1] the court denied the motion. On appeal, defendant contends that the trial court erred by not suppressing the arresting officer's in-court identification of the defendant.

At around 3 a.m. on March 25, 1982, Officer Wayne Heath received a telephone call at his home concerning a possible break-in at a retail store on Campground Road in New Haven. The store is located approximately five miles from the officer's home, in a sparsely populated, residential area. Officer Heath was met at the store by another officer, and, after checking the entrances and exits to the building, the two officers concluded that there had been no entry made into the building. This conclusion was based on the fact that none of the window or door locks had been disturbed, and on the fact that the officers knew that the store's alarm system had malfunctioned approximately ten times during the previous two or three months. Officer Heath testified that when he left the store to return to his home, he did not believe a crime had occurred.

On the drive back to his home, Officer Heath observed a vehicle on a gravel road commonly known as route 66. He had observed no vehicles on his way to investigate the possible break-in, and this was apparently the only car he saw on his return home. The officer, who had lived in the area for ten years and was generally familiar with the residences along route 66, did not recognize the vehicle, a 1980 brown Saab, as belonging to one of the route 66 residents. The Saab was not speeding, nor being operated in any unusual manner. When the officer's cruiser and the Saab converged at the junction of route 17, the officer observed that the car lacked a front license plate. As the vehicle continued on, Officer Heath made a left hand turn, turned to look back at the Saab through his rear window and saw that the rear plate had a white background with dark numbers. The officer made a U-turn in order to position himself behind the Saab; when he was close enough

---

[1] Other than the testimony of the owners of the vehicle respecting their ownership and the fact that they had never given the defendant, whom they did not know, permission to use their car, the only testimony was that of the arresting officer.

to discern the plate numbers, he radioed them to the police dispatcher in order to discover whether the plate was registered to the Saab. Officer Heath testified that the routine procedure, following a call to the dispatcher regarding a license plate check, was to do nothing until the dispatcher radioed back with the requested information. After following the Saab for a short distance, Officer Heath activated his blue light even though he had not heard from the dispatcher. The Saab slowed down as if, in the words of Officer Heath, "it was looking for some place to pull over." When the Saab did not stop, Officer Heath turned on his siren. The Saab continued for a short distance, then pulled into a driveway. Two people exited from the front of the car, one from the driver's side and one from the passenger's side, and began to run. The officer, who had pulled into the driveway behind the Saab, quickly got out of his cruiser and ordered the two people to stop, which they did after running "about ten to fifteen feet." Approaching the person who had exited the Saab from the driver's side, Officer Heath "commanded him to go down on the ground, face down, and spread his legs and arms." The officer handcuffed both the person on the ground and his companion, thus arresting them. On leading the two back to his cruiser, Officer Heath obtained his first look at the driver's face, which was illuminated by the cruiser's headlights. After he had placed the driver and his companion in the cruiser, the dispatcher called, informing him that the license plate was not registered to the Saab. Officer Heath testified that approximately eight to ten minutes had passed between his calling in the license plate check and the dispatcher's reply. At trial, based on his observation of the driver's face as he was leading him back to the cruiser, he identified the defendant as the person who had exited from the driver's side of the Saab.

On cross examination, the following colloquy occurred between defendant's attorney and Officer Heath concerning the officer's reasons for stopping the Saab:

Q. [I]t was basically your belief that no cars should be on Route 66 at that time in the morning that prompted the stop; is that correct?

A. I felt it was very ... unusual ....

Q. But there is nothing in particular about that unusualness that would tie . . . this particular car to any particular crime?

A. No . . . .

Q. So, more or less, it was just a hunch that you had?

A. Well, if that's the way you want to put it, yes.

Q. Had you seen that car at that same place at twelve noon without a front license plate and with a Massachusetts rear plate, would you have stopped it?

A. Probably not.

Q. So, to your knowledge, no motor vehicle violations had taken place prior to the stopping of the car?

A. That's right.

Q. And nothing existed other than your suspicions that tied that car into any illegal activity?

A. That's right.

Q. You at no time believed that that car was attempting to elude you; is that correct?

A. That's right.

The court found that at the time Officer Heath activated his blue light he did not have an articulable suspicion of wrongdoing regarding the vehicle or its occupants. This finding is not contested by the State. Under *Delaware* v. *Prouse*, 440 U.S. 648 (1979), the stopping of a motor vehicle that is being operated on a public highway, without "at least articulable and reasonable suspicion that [the] motorist is unlicensed or that [the] automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law" is an impermissible violation of the motorist's Fourth Amendment rights. *Id.* at 663. Here, Officer Heath's "suspicion" that the Saab did not belong in the particular area in the early morning hours, without more, clearly falls outside of an "articulable and reasonable" suspicion of some criminal wrongdoing. See *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ; *United States* v. *Montgom-*

*ery,* 561 F.2d 875, 879 (D.C. Cir. 1977) ; *Commonwealth* v. *Bacon,* 381 Mass. 642, 645–46, 411 N.E.2d 772, 774 (1980).

Having found that the stopping of the Saab was impermissible, the court nevertheless denied the motion to suppress because the defendant's presence in the car was wrongful and he therefore lacked standing to object to the stopping. The court cited *Rakas* v. *Illinois,* 439 U.S. 128 (1978), and *Graham* v. *State,* 47 Md. App. 287, 421 A.2d 1385 (1980), also relied on by the State in its brief, in support of its denial of defendant's motion.

Neither *Rakas,* nor its state court progeny, *Graham,* are directly relevant to the issues raised by the instant case. Defendant here is not objecting to the search of the automobile or other "premises," as in *Rakas,* nor is he objecting to evidence seized as a result of an allegedly unlawful search, as in *Graham.* In fact, in his concurring opinion in *Rakas,* Mr. Justice Powell expressly stated that the petitioners were not challenging "the constitutionality of the police action in stopping the automobile in which they were riding . . . ." *Rakas* v. *Illinois, supra,* 439 U.S. at 150–51 (Powell, J., concurring). This is the exact issue raised by the defendant at bar; his argument is that given the admitted unlawfulness of the stopping of the Saab, the arresting officer's in-court identification[2] of him as the driver of the Saab is suppressible because the identification directly emanated from the illegal stop.

---

[2] The defendant's motion to suppress was worded generally so as to include "all information, statements and physical evidence." The court's findings and the State's and the defendant's briefs interchangeably refer to a motion to suppress the officer's in-court identification, and a motion to suppress the defendant's physiognomy. The two, however, are not the same. The Supreme Court has not addressed the issue whether a defendant's face can be considered evidence and therefore a possible fruit of police misconduct. *United States* v. *Crews,* 445 U.S. 463, 474–75 (1980). But cf. *Frisbie* v. *Collins,* 342 U.S. 519, 522 (1952) (person whose "presence" in courtroom obtained illegally not denied due process). On the other hand, there is no question that verbal evidence, based on observations made during an unlawful invasion, may warrant the protection provided by the Fourth Amendment. *Wong Sun* v. *United States,* 371 U.S. 471, 485 (1963). During defendant's trial on the merits, the defendant and the court agreed that the evidence sought to be suppressed was the arresting officer's in-court identification of the defendant.

■ In *United States* v. *Crews,* 445 U.S. 463 (1980), the Supreme Court addressed the issue whether an in-court identification of the accused by the victim of the crime was suppressible as the fruit of the defendant's unlawful arrest. *Id.* at 465. The court ruled that the in-court identification was not suppressible because "the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity." *Id.* at 473. Conversely, when the in-court identification is a result of the unlawful police conduct committed before the testifier develops the capacity to make the identification, then the in-court identification may properly be suppressible. See *id.* at 470–71, 473, 477.

■ We are not suggesting that any observation of a car's occupants, later made the basis of an in-court identification, formed during or as a result of an illegal stop of the car by the police is subject to exclusion. Given the admitted illegality of a stop, the question then becomes one whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v. *United States,* 371 U.S. 471, 488 (1963) ; see *United States* v. *Wade,* 388 U.S. 218, 241 (1967) (independent origins test). Given the facts of the instant case, there is no question that Officer Heath's observation of the defendant as the driver of the Saab, made while leading the defendant back to the police cruiser after arresting him, "has been come at by exploitation" of the unlawful stopping of the Saab. *Wong Sun* v. *United States, supra,* 371 U.S. at 488.

As additional support for its order denying defendant's motion to suppress, the trial court found that "the action of the defendant . . . in fleeing the car was sufficient basis for the officer to inquire further." Implied in this finding are two propositions: (1) that the act of flight at the approach of the police is alone enough to provide reasonable justification for a detention or probable cause for an arrest; and (2) that a detention that is unlawful at its initiation can be righted after the fact.

■ In *Sibron* v. *New York,* 392 U.S. 40 (1968), the Supreme Court stated the rule that while the act of flight may

be indicative of guilty knowledge, it does not provide a proper basis for an arrest unless coupled with "specific knowledge . . . relating the suspect to the evidence of the crime." *Id.* at 66–67. This is because the mere act of fleeing, or some other furtive gesture, is an ambiguous act. *Miller* v. *United States,* 357 U.S. 301, 311 (1958); *Alberty* v. *United States,* 162 U.S. 499, 511 (1896); *People* v. *Superior Court,* 3 Cal. 3d 807, 817–18, 478 P.2d 449, 455, 91 Cal. Rptr. 729, 734–35 (1970). Here, at the time defendant took flight, Officer Heath had no articulable and reasonable suspicion that the car he had stopped, or its occupants, were in any way connected or associated with any wrongdoing; the act of defendant in running away could not alone provide Officer Heath with probable cause to arrest him. "A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting [officer has himself] provoked." *Wong Sun* v. *United States, supra,* 371 U.S. at 484.

■■ Nor may the stopping of the car and detention of the defendant, unlawful at its inception, be made lawful by what developed subsequent to the stop. *Henry* v. *United States,* 361 U.S. 98, 104 (1959); see *United States* v. *Rico,* 594 F.2d 320, 322 (2d Cir. 1979). "The concern of the exclusionary rules . . . center [sic] on the proposition that enforcement officers may not embark on groundless invasions of the person or premises and justify them by the fruits obtained. The requirement is that such incursions must be supported, *before the fact* . . . ." *State* v. *Oakes,* 129 Vt. 241, 250, 276 A.2d 18, 24 (1971) (emphasis added).

For the foregoing reasons, the defendant's motion to suppress the arresting officer's in-court identification should have been granted.

*Reversed and remanded.*