## State of Vermont v. David E. Chapman

[800 A.2d 446]

No. 00-442

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed April 12, 2002

*Lauren Bowerman*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Bradley S. Stetler* of *Stetler, Allen & Kampmann*, Burlington, for Defendant-Appellant.

**Skoglund, J.** Defendant was charged with driving while intoxicated, and a civil suspension proceeding was held pursuant to 23 V.S.A. § 1205. He appeals the denial of his motion to suppress all statements and evidence in his civil suspension proceeding, arguing that he was subjected to a de facto arrest without probable cause in violation of the United States and Vermont Constitutions. In the alternative, he argues that the stop and detention were done without reasonable and articulable suspicion of wrongdoing, also in violation of his constitutional rights. We agree and reverse.

The following facts are uncontested. On March 16, 2000, at approximately 9:10 p.m., Colchester Police Officer Roy received a dispatch that a vehicle was off the roadway near Route 7 and Poor Farm Road. The officer arrived at that location and observed an unoccupied Ford Explorer approximately four feet off the west side of Route 7. He also noticed a set of footprints in the snow leading from the car and heading north along the road for fifty to seventy-five yards. He then drove north to the Colchester variety store, where he asked the store owner if anyone had come to the store to report their vehicle off the road and was informed that there had been a person at the pay phone on the side of the building just prior to the officer's arrival. The officer found no one at the pay phone, but did see fresh footprints at the pay phone that were similar to those he saw leaving the Explorer. He followed the tracks to the rear of the store, then along the rear of the building and behind an adjacent storage building.

As the officer followed the tracks he came to a place where an offset in the building created a darkened nook. He saw a person's head "lean forward and peek out" of the darkened area. At this time the officer unholstered his gun, ordered the person to "freeze," and told him to come out. He then ordered the person to put his hands where the officer could see them, and turn around. The defendant testified

that at this time the officer ordered him to get down on his knees and then frisked him. The officer testified that he did not remember ordering the defendant to his knees and frisking him but agreed it was possible it had happened. The officer asked defendant if he had any weapons, and the defendant answered negatively. After holstering his gun, the officer conducted a field interview, asked the person who he was, what he was doing behind the building, and whether he was the proprietor of the Ford Explorer that was off the road on Route 7. The person identified himself as defendant, David Chapman, and stated that he had gone behind the building to urinate and that the Explorer was his vehicle. At this time the officer noticed an odor of intoxicants coming from defendant. The officer then asked defendant to go back to the police cruiser with him. There, the officer conducted field dexterity tests and ultimately processed defendant for DUI.

We review motions to suppress de novo. *State v. Graves*, 170 Vt. 646, 646, 757 A.2d 462, 463 (2000) (mem.). Defendant argues that he was subjected to a de facto arrest requiring probable cause when the officer, with no evidence that defendant had committed a crime, drew his gun, ordered defendant to freeze, keep his hands up, kneel down on the ground, and then frisked him for weapons. Defendant further contends that because the officer did not have probable cause to effect this de facto arrest, all evidence flowing from the improper arrest should be suppressed. The trial court did not address defendant's claim that he had been subjected to a de facto arrest. Rather, it held the officer was authorized under the circumstances to conduct a "brief detention," citing *Terry v. Ohio*, 392 U.S. 1 (1968), in order to confirm or dispel his "suspicions," and that it was reasonable to frisk the defendant for weapons. We agree with defendant that the interaction with the officer exceeded the bounds of a simple investigatory detention and therefore, regardless of any purported rationale in support of a *Terry* stop, rose to the level of a de facto arrest.

We have recognized that "[a] brief detention, its scope reasonably related to the justification for the stop and inquiry, is permitted in order to investigate the circumstances that provoke suspicion." *State v. Lambert*, 146 Vt. 142, 143, 499 A.2d 761, 762 (1985). As stated in *State v. Theetge*, "[t]he threshold issue is 'whether the officer had reasonable grounds to suspect that defendant was engaged in any wrongdoing at the time of the encounter.'" 171 Vt. 167, 170, 759 A.2d 496, 498 (2000) (citing *State v. Sutphin*, 159 Vt. 9, 11, 614 A.2d 792, 793 (1992)).

An investigative detention employs "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short

period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Courts have recognized, however, that an investigatory detention or *Terry* stop may become "too intrusive to be classified as an investigative detention" and may instead become the functional equivalent of a formal arrest. *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993) (citations omitted). "[I]f the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause." *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989). "Whether an arrest supportable by probable cause occurs, as distinct from a form of Fourth Amendment intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991). There is no bright line rule differentiating an arrest from a detention supportable by less than probable cause. See *Royer*, 460 U.S. at 506.

In assessing whether the degree of restraint is too intrusive to be classified as an investigative detention, courts have considered a number of factors, including:

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, ... and in particular such factors as the number of agents involved, ... whether the target of the stop was suspected of being armed, ... the duration of the stop, ... and the physical treatment of the suspect ... including whether or not handcuffs were used.

*Perea*, 986 F.2d at 645 (internal citations omitted); see also *Posr*, 944 F.2d at 98 ("Whether a seizure is an arrest or merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances.").

■Assessing the situation that confronted defendant herein, we first address the amount of force used by the officer, starting with the drawn weapon. The Second Circuit Court of Appeals has said "there is no hard and fast rule concerning the display of weapons" in investigative stops. *United States v. Harley*, 682 F.2d 398, 402 (2d Cir. 1982). That court has established the following factors in determining whether the display of a weapon by a police officer automatically converts a stop into an arrest: (1) the nature of the crime under investigation, (2) the degree of suspicion, (3) the location of the stop, (4)

the time of day, and (5) the reaction of the suspect on the approach of the police. See *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984). In *Nargi*, the court found that under the totality of the circumstances the police had sufficient specific and articulable facts to justify a brief police detention of Nargi's van. Nargi argued, however, that even if the police had reasonable grounds for detaining him, their actions in doing so were so intrusive as to convert the investigatory stop into an arrest. Specifically, he pointed to the fact that two of the three officers had their weapons drawn when his van was stopped. Using the factors listed above, the court considered that the suspected crime was a serious felony, there were solid grounds for the officers' suspicions of large-scale marijuana trafficking, that courts have repeatedly recognized that weapons are often used by persons engaged in such offenses, and that the stop took place at night in a dark, isolated part of the airport. Under these circumstances, the court found the officers were justified in acting cautiously and having two weapons drawn since there were articulable grounds for fearing danger. It held that the officers' behavior did not amount to an arrest. *Id.*

In *Perea*, the court concluded that the initial stop of the cab in which the defendant was riding was not an arrest, but rather was a lawful *Terry* stop because the United States Customs Service and the United States Drug Enforcement Agency agents, given their surveillance observations, had a reasonable suspicion of criminal activity. 986 F.2d at 644. Further, it held that the fact that the officers approached with guns drawn in order to protect themselves and bystanders on the street did not necessarily "transmute a *Terry* stop into an arrest." *Id.* (citing *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) ("law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists")).

The consistent approach to the issue of whether the use of weapons by law enforcement during an investigative seizure transmutes a *Terry* stop into an arrest is an analysis of what level of danger the suspect presented and how reasonable the police actions were under the circumstances. "What might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when . . . officers have reason to fear that a suspected criminal is armed." *Harley*, 682 F.2d at 402.

In this case, although it was nighttime and the officer confronted the defendant in an isolated area, there was no evidence that defendant was suspected of serious criminal activity or of being armed, or that he presented, in any way, a significant risk of danger to the officer. Certainly the ability of police officers to protect themselves in hazardous situations is crucial. However, the officer never testified that he was facing a dangerous situation or a dangerous defendant. He was not in pursuit of a person suspected of a serious crime — one, such as narcotics trafficking, that has often been recognized as involving weapons, as in *Nargi*. Nor was there reasonable suspicion of serious criminal activity based on a thorough criminal investigation as in *Perea.* The State is forthright in conceding that it is not relying on the trial court's theory, unsupported by any evidence, that the officer was investigating a possible burglary.*

What was the basis for the officer's stop of defendant? In support of the trial court's finding that the encounter was a brief investigatory stop, justified by a reasonable suspicion of wrongdoing, the State suggests on appeal that the location of the vehicle off-road and footprints by the pay phone, similar to those sighted near the vehicle, may have given rise to a reasonable suspicion of a traffic law violation. The State speculates that the officer may have suspected a violation of 23 V.S.A. § 1101, which provides: "(a) No person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway . . . ." Whether there is a violation of § 1101 when a car is four feet off the paved or main-traveled part of the highway is less important than the fact that, at the hearing on defendant's motion to suppress, the State offered no evidence to support this theory.

The State argues in the alternative, and for the first time on appeal, that the officer's actions were justifiable as part of a community caretaking function. In some circumstances, "police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out 'community caretaking' functions to enhance public safety." *State v. Marcello,* 157 Vt. 657, 658, 599 A.2d

---

* The dissent ignores the shortcomings in the record and instead adopts the musings of the trial judge that the officer was investigating a burglary, notwithstanding the fact that there was no evidence offered to support this judicial justification. The trial judge attributed to the officer intentions that were unsupported by the officer's own testimony. That the officer was not prompted to testify what suspicion of wrongdoing he may have had is no fault of his own. But it does not permit the trial court, or this Court, to engage in post hoc justifications in order to shore up a scant record.

357, 358 (1991) (mem.) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). However, there must be specific articulable facts justifying the intrusion. *State v. Burgess*, 163 Vt. 259, 262, 657 A.2d 202, 204 (1995). The only support the State offers for this theory is that there was a car off the side of the road and the officer could have reasonably perceived its operator was in need of assistance. Yet the State elicited no evidence from the officer in support of this theory.

 The officer's actions were not warranted by the circumstances, as described by the evidence presented, and thus support the conclusion that the encounter was "too intrusive" to be classified as an investigative detention. When a person is reduced to police custody without formal arrest that exercise of police control is treated as either unauthorized or as a de facto arrest. See *State v. Carmody*, 140 Vt. 631, 636, 442 A.2d 1292, 1294 (1982). For purposes of this appeal, we find that the officer effectuated a de facto arrest of defendant that was unsupported by probable cause because the officer did not have a reasonable belief that the defendant had committed or was about to commit a crime. See *State v. Caron*, 155 Vt. 492, 499, 586 A.2d 1127, 1131 (1990) (probable cause to arrest exists where facts and circumstances are sufficient to warrant a prudent person to believe that the defendant had committed an offense); *State v. Greenslit*, 151 Vt. 225, 228, 559 A.2d 672, 674 (1989) (probable cause for arrest exists where the facts and circumstances within the officer's knowledge are sufficient in themselves to warrant a person of reasonable caution to believe a crime is being committed). Evidence of defendant's intoxication was gathered during that unauthorized arrest. We have previously invoked the exclusionary rule, a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect, in order to suppress admission at trial of unlawfully obtained evidence, and evidence that is the fruit of unlawful police conduct. See, e.g., *State v. Laflin*, 160 Vt. 198, 201, 627 A.2d 344, 346 (1993); *State v. Badger*, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982). See also *State v. Lussier*, 171 Vt. 19, 33, 757 A.2d 1017, 1026 (2000) (extending the exclusionary rule to civil suspension proceedings in order to protect core value of privacy embraced by Chapter I, Article 11 of the Vermont Constitution, to promote public trust in the judicial system, and to assure that unlawful police conduct is not encouraged). By excluding evidence wrongfully obtained in unlawful searches and seizures, the effect is a "tendency to promote institutional compliance with Fourth Amendment requirements on the part of law enforcement agencies generally," in addition to promoting compliance by individual

officers who are "penalize[d]" under the rule for Fourth Amendment violations. *State v. Oakes*, 157 Vt. 171, 180, 598 A.2d 119, 125 (1991) (internal citations omitted).

For the reasons stated above, the State's evidence against defendant, obtained as a result of Officer Roy's de facto arrest, is inadmissible. We therefore grant defendant's motion to suppress.

*Reversed.*

**Dooley, J.,** concurring. I would hold that the denial of the motion to suppress must be reversed, but I would avoid the controversy that has dominated the two opinions. There is nothing more telling than an advocate's unwillingness to support the trial court's rationale for its decision. Here, the trial court justified its decision based on the officer's suspicion that a burglary might be in progress. The dissent has adopted this rationale. The State has, however, specifically stated in its brief that it is *not* relying on this rationale.

The State nevertheless tries to save its conviction by positing two alternative rationales for denying the motion to suppress. The first is that the officer was investigating a violation of 23 V.S.A. § 1101(a), which requires that an operator not park a vehicle "upon the paved or main-traveled part of the highway." The only evidence, however, was that defendant's vehicle was "off the road," some four feet beyond the fog line. I cannot accept that there was reasonable suspicion of criminal activity based on the placement of the vehicle.

The second rationale is that the officer was acting pursuant to the community caretaking function. Putting aside the total inconsistency between the officer's conduct and a rationale based on helping a motorist in distress, I would hold that this rationale disappeared once it became clear that defendant had reached a place of safety and used the telephone. Based on the observation of the tracks, the officer knew at that point that it was the owner of the vehicle who used the telephone.

Because the detention of defendant cannot be justified by either reasonable and articulable suspicion or the community caretaking function, I would hold that it was unlawful. Because any detention was unjustified, I cannot agree that the denial of the motion to suppress can be justified on inevitable discovery.

**Morse, J.,** dissenting. In evaluating the reasonableness of an investigative stop, the United States Supreme Court has counseled that "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

The degree of force that a police officer employs to effectuate the stop must be proportional to the circumstances confronting the officer. See *Florida v. Royer*, 460 U.S. 491, 500 (1983). Again, however, a court's evaluation must be realistic, viewed from the perspective of the officer on the scene rather than from the serenity of a judge's chambers. See *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Echoing these concerns, the United States Supreme Court has cautioned:

> A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing . . . . . A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." . . . The question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Sharpe*, 470 U.S. at 686-87 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)).

The Court here concludes that the investigating officer employed excessive force, thereby escalating an investigative stop into a de facto arrest lacking in probable cause. With respect, I believe the Court has indulged in precisely the sort of "second guessing" that the United States Supreme Court has cautioned against. The result, I fear, is to impose on our law enforcement officers the sort of "Hobson's Choice" condemned by the court in *United States v. Jackson*, 652 F.2d 244, 249-50 (2d Cir. 1981), forcing the officer to choose between approaching a suspect with gun holstered, thereby increasing the risk of being attacked, or drawing one's weapon and increasing the risk that a court "will set the criminal free by construing his action as an illegal arrest." Like the court in *Jackson*, I am loath to create such a dangerous dilemma for our law enforcement personnel. Accordingly, I respectfully dissent.

The record evidence summarized in the Court's decision amply supports the trial court's finding that the investigating officer acted reasonably in tracking a set of footprints from an abandoned car on

Route 7 north toward a small complex of stores. The Court does not dispute this finding, nor indeed would any legal basis exist to challenge it. Under the so-called "community caretaking function," any reasonable officer would be justified, if not indeed compelled, to attempt to locate the missing driver of an abandoned vehicle parked some four feet off the highway. See *State v. Marcello*, 157 Vt. 657, 658, 599 A.2d 357, 358 (1991) (mem.) (police officers may intrude on person's privacy without reasonable suspicion of criminal activity "to carry out 'community caretaking' functions to enhance public safety") (quoting *Cady*, 413 U.S. at 441)).

After following a circuitous set of footprints to the rear of the stores, which included a gift shop closed for the evening, the officer observed a person lean forward and peek out from behind a darkened corner of the building. At this point, the trial court found that

> the nature of the Officer's investigation changed. What had begun as the investigation of a disabled vehicle was transformed into the investigation of suspicious activity: it was night time, and fresh tracks were found leading to an isolated area behind commercial buildings. Although the Officer did not articulate his response to the circumstances in these terms, he was investigating the possibility of criminal activity — a possible burglary — in progress. The Officer's suspicions were enhanced when he found the Defendant peeking out from a darkened nook behind the stores.

Here again, the trial court's conclusion was sound. As noted earlier, the reasonableness of an investigative detention must be judged from the perspective of the officer on the scene in light of the totality of the circumstances. The officer here obviously did not know the intentions of the individual in question, but given that he appeared to be hiding and behaving furtively, that the hour was late, and that the building housed a gift shop it was not unreasonable to suspect that something was amiss, including a possible burglary or even assault. When asked why he unholstered his revolver, the officer responded that he was acting according to his training, and indicated that it was "for my safety and his."* Although the officer did not testify that he also

---

* The full text of the question and answer in this regard is as follows:

> Q. Officer Roy, there's been a lot of questions about your weapon. Why did you pull your weapon out that night?

suspected a burglary, this is not controlling. The question is whether the circumstances objectively suggested a reasonable suspicion of wrongdoing. See *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *State v. Boyea*, 171 Vt. 401, 415, 765 A.2d 862, 872 (2000). Viewed from the perspective of a reasonable officer on the scene, I believe they clearly did.

The same standard of reasonableness for determining the justification of the detention applies to the officer's show of force. As the court in *United States v. Alexander*, 907 F.2d 269 (2d Cir. 1990), observed: "There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops. . . . A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself . . . . 'The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* at 272 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). When the officer here observed an unidentified individual in the shadows behind a closed shop lean forward and peek out, it was not unreasonable to unholster his revolver, command the individual to come out with his hands showing, and conduct a quick pat-down search. There was simply no way for the officer to know — in that instant — whether the person was hiding from the officer or lying-in-wait; whether he was alone or had a compatriot; whether he was armed, intoxicated, or otherwise unstable. The uncertainty and potential danger was compounded, moreover, by the fact that it was late at night, dark, and the officer was alone and isolated.

In these circumstances, it appears to me self-evident that the officer exercised precisely that amount of force reasonably necessary to ensure his safety by swiftly exerting control over defendant and ascertaining his intentions. Although he unholstered his weapon, there was no evidence that the officer held defendant at gunpoint, or restricted his physical movement with handcuffs or any other physical

---

A. Certainly my training is such that if you're following an individual in a situation like I was, come around a corner and have someone surprised from a darkened area, which clearly is a place that that individual chose to put himself, I think for my safety and his —

Q. The area was not well lit?

Mr. Stetler: Objection form of the question.

A. Relatively dark back there.

THE COURT: Overruled.

force for any length of time. On the contrary, the officer testified without contradiction that his weapon was holstered almost immediately, and that he proceeded to conduct a quick pat-down search of defendant and to question him about his reasons for being there. "Without exceeding *Terry* guidelines, the police may do what is necessary to command the suspect's attention and bring him to a stop, ... and to protect themselves and the public from unnecessary exposure to risk of injury." *Commonwealth v. Fitzgibbons*, 502 N.E.2d 142, 145-46 (Mass. App. Ct. 1986). That describes precisely the nature of the officer's actions here. Accordingly, I find no basis in the record to support a conclusion that the officer utilized such excessive force that it transformed the nature of the seizure from an investigatory stop into an arrest requiring probable cause.

I would affirm the well-reasoned judgment of the trial court denying defendant's motion to suppress. I am authorized to state that Chief Justice Amestoy joins in this dissent.